# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

CHARLES KENNETH RUSSO,

        Plaintiff,

    v.

ANDREW SAUL,
Commissioner of Social Security,

        Defendant.

_____/

Case No. 1:19-cv-01453-SKO

ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT

(Doc. 1)

## I.      INTRODUCTION

Plaintiff Charles Kenneth Russo ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. § 1383(c).  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

///

---

[1] The parties have consented to the jurisdiction of the U.S. Magistrate Judge.  (Docs. 7,8.)

## II.     BACKGROUND

Plaintiff protectively filed his SSI application on July 7, 2016, alleging disability as of August 29, 2014, due to lumbar spondylosis, bulging disc, osteoarthritis, degenerative disc disease, spinal stenosis, anxiety, depression, and auditory hallucinations.  (Administrative Record ("AR") 13, 118, 119, 131, 132, 136, 159, 251, 256, 284, 291, 299.)  Plaintiff was born on February 10, 1976, and completed two years of college  (AR 21, 51, 118, 131, 251, 257, 291, 299.)

### A.     Relevant Medical Evidence[2]

#### 1.     Physical Medical Evidence of Record

On July 30, 2015, Plaintiff was admitted to Community Medical Center Hospital for left-sided chest pain, worsening with a deep breath, with dizziness, dyspnea on exertion, and cough. (AR 321–22.)  Upon examination, Plaintiff was observed to look "sick and tired," yet not in respiratory distress, and was noted to be "morbidly obese."  (AR 327.)  A chest CT scan was performed and showed a bilateral massive pulmonary embolism.  (AR 329, 341.)  Plaintiff was admitted into the intensive care unit.  (AR 343.)

Plaintiff underwent a cardiovascular consultation with Usman Javed, M.D., who diagnosed him with "[s]ubmassive pulmonary embolism, with borderline hemodynamics with a large thrombus burden in bilateral pulmonary arteries"; "[l]eft-sided pleural effusion"; and obesity.  (AR 338.)  Dr. Javed prescribed anticoagulation therapy and ordered a catheter-directed ultrasound-assisted thrombolysis, which was performed on July 31, 2015.  (AR 345–46, 710–11.)  Plaintiff was discharged from the hospital in stable condition on August 4, 2015.  (AR 347–48.)

On August 7, 2015, Plaintiff presented to Dr. Javed for a post-discharge follow up.  He reported residual dyspnea on exertion, which was "much improved" than when he presented to the emergency room.  (AR 620.)  Dr. Javed assessed Plaintiff with pulmonary embolism, pleural effusion, and hyperlipidemia.  (AR 620.)  He noted that Plaintiff had "done well after [his] catheter-directed thrombolysis with good clinical results," and recommended that Plaintiff continue with his anticoagulation therapy.  (AR 620.)

---

[2] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

On August 25, 2015, Plaintiff established care with hematologist A. Mustajeeb Haseeb, M.D. of the California Cancer Associates.  (AR 575–79.)  A history of lumbar spondylosis, spinal stenosis, degenerative disc disease and arthritis in Plaintiff's lumbar spine was noted, for which he took pain medication Percocet and Soma.  (AR 575.)  Dr. Haseeb noted that Plaintiff's symptoms had improved, including his shortness of breath, and there was no complaint of "active pain" at that time.  (AR 576.)  Plaintiff's physical examination was normal (AR 577), and recommended that he remain on anticoagulation therapy "indefinitely" and repeat a CT angiogram in three months (AR 578).

Plaintiff followed up with Dr. Javed in October 2015.  (AR 618.)  Dr. Javed noted that Plaintiff had "excellent clinical results" following this thrombolysis procedure, and has "done well" since starting his anticoagulant treatment.  (AR 618.)

In April 2016, Plaintiff presented for a follow up with Dr. Haseeb.  (AR 558–60.)  Plaintiff's physical examination was normal, with regular rate and heart rhythm, no tenderness or swelling in his back, normal range of motion, no weakness, and normal gait.  (AR 559.)  He noted Plaintiff was "generally doing okay" and reported no new symptoms.  (AR 560.)

On October 2, 2016 Plaintiff reported moderate ("3/10") chronic back pain that began in 2015.  (AR 543–50.)  He was assessed with bilateral low back pain with left-sided sciatica.  (AR 546.)  Later that month, Plaintiff presented for a follow up with Dr. Haseeb.  (AR 555–57.) Plaintiff's physical examination was again normal, with no tenderness or swelling in his back, normal range of motion, normal range of motion, no weakness, and normal gait.  (AR 556.)  Dr. Haseeb found Plaintiff "alert and oriented times three" with coherent speech.  (AR 556.) He noted Plaintiff was "generally doing well," with no evidence of any disease or pulmonary embolism.  (AR 557.)  He was advised to continue his anticoagulation therapy.  (AR 557.)

At a follow up appointment in November 2016, Dr. Javed noted that Plaintiff had made a "good clinical recovery" and was tolerating anticoagulation therapy, which he will continue for his lifetime, well.  (AR 616.)  He noted that Plaintiff has "residual class II dyspnea symptoms" that he experiences only with moderate to severe activity but there is no clinical evidence of pulmonary hypertension.  (AR 616.)  Dr. Javed observed that Plaintiff would be a candidate for a bariatric

surgery evaluation, in view of his inability to lose weight.  (AR 616.)

In April 2017, Plaintiff presented to Dr. Haseeb for a follow up.  (AR 781–83.)  He was noted to be "devoid of any symptoms" and had no problems with issues following his thrombosis.  (AR 781.)  Plaintiff reported tolerating his anticoagulation therapy well.  (AR 781.)  His physical examination was normal, with normal range of motion, strength, and tone, and no tenderness to his back or spine upon palpation and percussion.  (AR 781–82.)  Plaintiff's liver and kidney function were "essentially unremarkable."  (AR 781.)  Dr. Haseeb observed Plaintiff was "generally doing excellent" and had no evidence of any progression of thrombosis.  (AR 783.)  He encouraged Plaintiff to try to lose weight, be active, and eat healthy.  (AR 783.)

A chest X-ray performed in July 2017 showed "peripheral left mid-lung parenchymal scarring," but otherwise clear lungs.  (AR 724.)  In September 2017, Plaintiff presented to Vijai Daniel, M.D., a practitioner of pulmonary, critical care, and sleep medicine.  (AR 798–99.)  He denied cough, daytime fatigue, or wheeze, but stated that he has been experiencing dyspnea for over two years.  He stated to Dr. Daniel that he had no new symptoms and was "overall doing well."  (AR 798.)  Plaintiff reported he can ambulate without feeling winded.  (AR 798.) He denied chest pain or use of an inhaler.  (AR 798.)  Dr. Daniel's physical examination of Plaintiff was normal, but his morbid obesity noted.  (AR 799.)  Plaintiff was negative for back pain that same month.  (AR 658.)

In December 2017, Plaintiff complained of low back pain.  (AR 667.)  His physical examination was normal.  (AR 667–68.)  He was assessed with chronic pain syndrome and advised to follow up.  (AR 668.)

### 2.      Psychiatric Medical Evidence of Record

Following a psychiatric evaluation by Lana Williams, M.D. in April 2014, Plaintiff was diagnosed with anxiety and depression and prescribed medication.  (AR 416–19.)  In November 2014, Plaintiff reported being frustrated, hearing voices, and feeling paranoid.  (AR 430.)  He stated his medications helped control his mood and anxiety.  (AR 430.)  Dr. Williams prescribed an anti-psychotic medication to treat his psychosis.  (AR 431.)

In January 2015, Plaintiff reported his medications are helping decrease his anger but that

he is having a "rough time at home," with increased auditory hallucinations and stress.  (AR 436.)  On examination, Plaintiff's mood was "anxious."  (AR 437.)  Dr. Williams increased the dosage of his antipsychotic medication.  (AR 437.)  The next month, Plaintiff reported doing "pretty good" and liking his current medication regimen.  (AR 438.)  His auditory hallucinations had decreased, sleep had improved, and his mood was stable.  (AR 438.)

Plaintiff presented for a follow up appointment with Dr. Williams in March 2015, and reported "doing well" with his symptoms controlled.  (AR 440.)  In June 2015, Plaintiff was feeling "pretty good," with some infrequent residual auditory hallucinations when agitated.  (AR 442.)

In April 2016, Plaintiff reported feeling "ok" and his medications were working well.  (AR 448.)  Both his anxiety and his auditory hallucinations were decreased.  (AR 448.)  Plaintiff was "doing well" in August 2016, noting "minor" auditory hallucinations but improved sleep.  (AR 451.)

Plaintiff reported doing "pretty good" in December 2016, with a better mood and feeling "less wound up."  (AR 811.)  His irritability was decreased and his auditory hallucinations still present but "manageable."  (AR 811.)  In April 2017, Plaintiff gave a similar report to Dr. Williams that he was "doing well," getting good sleep, and that his hallucinations were not unbearable.  (AR 813.)  Plaintiff reported his sleep was "very good" with a stable mood in August 2017.  (AR 815.)

In December 2017, Plaintiff reported being "on edge" for a few days, but returned to normal.  He reported his auditory hallucinations were "quiet."  (AR 817.)  In April 2018, Plaintiff reported to Dr. Williams a decrease in his hallucinations and anxiety with a good mood.  (AR 819.)

### 3.    Opinion Evidence

During his examination in April 2016, treating hematologist Dr. Haseeb rated Plaintiff's ECOG Performance Status as a "1 – No physically strenuous activity, but ambulatory and able to carry out light or sedentary work (e.g., office work, light house work)."[3]  (AR 559, 795.)  Dr. Haseeb gave the same rating during his examination in October 2016.  (AR 133, 556, 787.)

On September 23, 2016, C. Bullard, M.D., a state agency physician, reviewed the record

---

[3] See "ECOG Performance Status," ECOG-ACRIN CANCER RESEARCH GROUP, found online at https://ecog-acrin.org/resources/ecog-performance-status (last visited January 29, 2021).

1   and assessed Plaintiff's residual functional capacity (RFC).[4]  (AR 215–18.)  Dr. Bullard and found

2   that Plaintiff could occasionally lift and/or carry 20 pounds and frequently 10 pounds; stand and/or

3   walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday;

4   perform unlimited pushing and pulling, subject to the above lift-and-carry restrictions; occasionally

5   climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and not climb ladders, ropes, and

6   scaffolds.  (AR 124–25.)  Upon reconsideration on December 13, 2016, another state agency

7   physician, L. DeSouza, M.D., reviewed the record and affirmed Dr. Bullard's findings.  (AR 141–

8   42.)  In so doing, Dr. DeSouza gave Dr. Haseeb's opinion "great weight."  (AR 140.)

9         State agency physician E. Aquino-Caro, M.D., reviewed the record and assessed Plaintiff's

10  mental RFC on October 4, 2016.  (AR 126–27.)  Dr. Aquino-Caro opined that Plaintiff was

11  moderately limited in his ability to: carry out detailed instructions; maintain attention and

12  concentration for extended periods; work in coordination with or in proximity to others without

13  being distracted by them; and interact appropriately with the general public.  (AR 126–27.)  Upon

14  reconsideration on December 8, 2016, another state agency physician, D. Funkenstein, M.D.,

15  reviewed the record and affirmed Dr. Aquino-Caro's findings.  (AR 142–44.)

16  **B.    Plaintiff's Statement**

17        On July 15, 2016, Plaintiff completed an adult function report.  (AR 264–72.)  Plaintiff

18  reported that his back pain makes it impossible to stand, sit, or walk for more than a few minutes

19  at a time, and his mental conditions make talking and interacting with others "very hard."  (AR

20  264.)  When asked to describe what he does from the time he wakes up to the time he goes to bed,

21  Plaintiff reported that his wife helps dress him and prepares food for the day, after which he lies on

22  a recliner and watches television or reads.  (AR 265.)  His wife also helps him bathe, and he needs

23  reminders for personal grooming and to take medication.  (AR 266.)  Plaintiff reported he does no

24

---

25  [4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  TITLES

26  II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an

27  individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and

28  'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

cooking or household chores due to back pain.  (AR 266.)  He has trouble sleeping due to hearing voices.  (AR 265.)

Plaintiff goes outside at least twice a week and can drive.  (AR 267.)  He shops for household items in stores and online usually once a week.  (AR 267.)  Plaintiff reported talking socially with others every day and attending doctor's appointments once a week.  (AR 267.)  He gets aggressive when around others due to his anxiety and auditory hallucinations and avoids being in public.  (AR 269.)

Plaintiff reported he is able to lift 10–15 pounds; can stand and walk for 10–15 minutes at a time; can sit for 30 minutes at a time; is "very limited" in his ability to squat, bend, climb, and kneel; and cannot remember tasks, concentrate, or follow directions well due to hearing voices.  (AR 269, 271.)  He stated he is limited in his ability to get along with others and "can't stand being around people."  (AR 271.)

**C.     Plaintiff's Wife's Statement**

On July 15, 2016, Plaintiff's wife Amy Russo completed a third-party adult function report.  (AR 274–81.)  Ms. Russo stated that Plaintiff has a "hard time" being around others due to his anxiety, depression, and hearing voices.  (AR 274.)  Plaintiff's back pain makes him unable to perform daily tasks, including personal care and cooking.  (AR 274–76.)  Ms. Russo reported that she must remind Plaintiff to complete personal grooming tasks and to take his medications.  (AR 275.)  He has trouble sleeping due to back pain and his hallucinations.  (AR 275.)

Mrs. Russo reported that Plaintiff can only lift 5–10 pounds; can walk 10 minutes at a time; can sit 20 minutes at a time; cannot squat, bend, kneel, or climb; and has trouble following directions and completing tasks due to memory problems.  (AR 279, 281.)  He gets aggressive and agitated easily due to his anxiety and hallucinations and avoids people.  (AR 279.)

**D.     Administrative Proceedings**

The Commissioner denied Plaintiff's current application for benefits initially on October 5, 2016, and again on reconsideration on December 15, 2016.  (AR 13, 152–55, 159–165.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 166–83.)

On August 21, 2018, Plaintiff appeared with counsel and testified before an ALJ as to his alleged disabling conditions.  (AR 30–41.)   A vocational expert ("VE") also testified at the hearing.  (AR 41–44.)

### 1.   Plaintiff's Testimony

Plaintiff testified that he has taken blood thinners since July 2015 and must be extremely careful due to chronic blood thinner use.  (AR 33.)  He testified to permanent lung and heart damage and that he continues to experience shortness of breath.  (AR 33.)  Regarding his lumbar back pain, Plaintiff testified he has been prescribed pain medication but was not recommended for surgery.  (AR 34.)  According to Plaintiff, his back pain is aggravated by standing and sitting.  (AR 36–37.)  He reported that his auditory hallucinations impact his ability to concentrate or hear what others are saying.  (AR 34.)

Plaintiff testified that he can walk for 30 minutes before having to stop and rest for 15–20 minutes; he can sit for 30–40 minutes and lift 40–50 pounds.  (AR 35–37.)  He typically lies down for three hours a day.  (AR 36.)  In addition to physical limitations, Plaintiff testified to difficulty concentrating and being around people due to hearing voices  (AR 38.)  According to Plaintiff, he would get into arguments when he worked, and he recently had an altercation with a neighbor.  (AR 39–40.)  He testified that he "likes" his medications and that they help him.  (AR 41.)

### 2.   Vocational Expert's Testimony

The ALJ asked the Vocational Expert ("VE") to consider a person of Plaintiff's age and education, and work history.  (AR 42.)  The VE was also to assume this person have following limitations: can lift/carry no more than 10 pounds occasionally or frequently; can push/pull within those weight limits; can stand/walk no more than two hours in an eight-hour workday; can sit six hours in an eight-hour workday, with no prolonged walking greater than about 30 minutes; must stand and stretch every other hour for about a minute; must rest every two hours for 10-15 minutes with normal breaks and lunch periods; when there is not a break, must stand and stretch for about a minute; cannot kneel, crawl, or climb ladders, ropes, and scaffolds; cannot be exposed to work hazards such as unprotected heights, operating fast or dangerous machinery, or driving commercial vehicles; can complete non-complex, routine tasks in a static work environment;

cannot perform jobs that required hypervigilance or watching out for the safety of others; can have occasional contact with the public; and can occasionally perform tasks that require teamwork.  (AR 42–43.)  The VE testified that such a person could perform work as a table worker, Dictionary of Operational Titles ("DOT") code 739.687-182, sedentary exertion level, with a specific vocational preparation (SVP)[5] of 2, for which there are 18,014 jobs in the national economy.  (AR 43.)  The VE also testified that such a person could perform work as a lens inserter, DOT code 713.687-026, sedentary exertion level, and SVP 2, for which there are 120,000 jobs, and could also perform work as an assembler, DOT code 734.687-018, sedentary exertion level and SVP 2, for which there are 28,000 jobs in the nation.  (AR 43.)

In a second hypothetical, the VE was asked by the ALJ to consider this same person as in the first hypothetical, but include the additional limitation that the person would be productive only four to six hours in an eight-hour workday because of an inability to concentrate, focus, stay on task, and get along with others due to hallucinations and other mental symptoms.  (AR 43.) The VE testified that no work would be available.  (AR 43.)  The ALJ's third hypothetical concerned the same person in the first hypothetical, with the additional limitation that the person would miss two or mot days of work every month on a regular basis.  (AR 43.)  The VE testified that no jobs were available for that person.  (AR 43.)

Plaintiff's counsel asked the VE to consider the person presented in the first hypothetical, but who required additional supervision for redirection for 20 percent of the workday.  (AR 44.) The VE responded that there would be no work on a "competitive basis" such a person could perform—it would require a "sheltered setting."  (AR 44.)

**E.      The ALJ's Decision**

In a decision dated November 13, 2018, the ALJ found that Plaintiff was not disabled.  (AR 13–22.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920(a)(4). (AR 15–22.)  The ALJ determined that Plaintiff had not engaged in substantial gainful activity

---

[5] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id.*

since July 7, 2016, the application date (step one).  (AR 15.)  At step two, the ALJ found Plaintiff's following combination of impairments to be severe: degenerative disc disease of the spine with stenosis; history of pulmonary embolism and effusion; history of deep vein thrombosis; anxiety; depression and obesity.  (AR 15–16.)  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 16–18.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at steps four and five.  *See* 20 C.F.R. §  416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . .  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff had the RFC:

> to perform sedentary work as defined in 20 CFR [§] 416.967(a) except he can stand and walk for no more than two hours and sit six hours total in an eight hour workday; with no prolonged working for greater than about thirty minutes.  He must be able to stand and stretch every other hour for about one minute and ability to rest every two hours for about ten to fifteen minutes falling within the normal breaks and lunch periods.  [Plaintiff] can never kneel, crawl, or climb ladders, ropes or scaffolds.  [Plaintiff] can never work around hazards such as unprotected heights, operating fast or dangerous machinery or driving commercial vehicles.  He is limited to non-complex routine tasks in a static work environment; no jobs that require hypervigilance or watching out for the safety of others; occasional contact with the public and occasional tasks that require teamwork.

(AR 18.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" the ALJ rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record . . . ."  (AR 19.  The ALJ determined that Plaintiff had no past relevant work (step 4), but that he was not disabled because, given his RFC, he could perform a significant number of other jobs in the local and national economies, specifically table worker, lens inserter, and assembler (step 5).  (AR 21–22.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on February 13, 2019.  (AR 14–19.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

///

### III.    LEGAL STANDARD

**A.    Applicable Law**

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920. The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)).

"However, if a claimant establishes an inability to continue her past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098). "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins*, 466 F.3d at 885). "[T]he burden of showing that

an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.      DISCUSSION

Plaintiff contends that there is no substantial evidence to support the ALJ's RFC assessment of Plaintiff's mental and physical limitations; that the RFC does not support a finding of non-disability; and that the ALJ erred in discounting Plaintiff's testimony and the third-party witness statement of Plaintiff's wife . (Doc. 20; Doc. 27.)  He asserts that the ALJ acknowledged a "lack of treating or examining physician opinion evidence," but failed to develop the record accordingly, and instead relied on her own lay interpretation of the medical evidence.  (Doc. 20 at 16–18.) Plaintiff further submits that inclusion of the phrase "no prolonged working" in the ALJ's RFC assessment creates an ambiguity that requires remand.  (*Id*. at 19–20; *see also* Doc. 27 at 2–4.) Finally, Plaintiff contends the ALJ has neither articulated clear and convincing reasons to discredit Plaintiff's symptomology testimony, nor provided germane reasons to discount Plaintiff's wife's statement.

The Commissioner responds that Plaintiff failed to preserve the issue for appeal because his counsel told the ALJ at the hearing that the record was complete.  (Doc. 26 at 12–15.)  The Commissioner contends, alternatively, that there was no ambiguity in the record giving rise to duty to develop, and instead the lack of opinion evidence was the result of Plaintiff's failure to meet his burden of proving disability.  (*Id*. at 15.)  In addition, the Commissioner maintains that the typographical error in the ALJ's RFC assessment was harmless and does not warrant remand.  (*Id*. at 17–19.)  Lastly, the Commissioner contends that the ALJ's discounting of Plaintiff's subjective symptom statements was not erroneous, and that she properly evaluated Plaintiff's wife's witness statement.

The Court addresses the parties' contentions below, and finds that reversal is not warranted.

### A.      Plaintiff's Challenge to the Record Does Not Constitute Reversible Error

#### 1.      The Issue Has Not Been Preserved

Preliminarily, as a rule, "when claimants are represented by counsel, they must raise all

1   issues and evidence at their administrative hearings in order to preserve them on appeal." *Meanel*

2   *v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999).  Here, as the Commissioner points out, Plaintiff was

3   represented by counsel at the administrative hearing—the same counsel who represents him before

4   this Court—who expressly stated that the record was complete when asked by the ALJ.  (AR 30

5   ("ALJ: We have records that go through April 2018.  In your opinion, do we have a complete

6   record?  ATTY: Yes, Your Honor.").); *see Meanel*, 172 F.3d at 1115; *Howard v. Astrue*, 330 F.

7   App'x 128, 130 (9th Cir. 2009) (issue waived because attorney had opportunity to raise it at

8   administrative hearing but did not do so); *Ryan Patrick A. v. Berryhill*, No. EDCV 17-2526-JPR,

9   2019 WL 1383800, at *7 (C.D. Cal. Mar. 27, 2019) (issue forfeited where the plaintiff was

10  represented by counsel at the administrative hearing, who twice stated that the record was

11  complete); *Valdez v. Berryhill*, Case No. SA CV 16-0980 JCG, 2018 WL 317799, at *1 (C.D. Cal.

12  Jan. 5, 2018) (issue not properly preserved where the plaintiff was represented by counsel at the

13  administrative hearing and specifically stated he had "no objection" to the record when asked by

14  the ALJ).  Accordingly, the issue is not properly preserved for appeal.  *See Smith v. Saul*, No. 1:19-

15  cv-01085-SKO, 2020 WL 6305830, at *7 (E.D. Cal. Oct. 28, 2020).

16          **2.      The ALJ Had No Duty to Develop the Record**

17          Even if the issue had not been forfeited, Plaintiff has not shown that it warrants remand.

18          "An ALJ's duty to develop the record further is triggered only when there is ambiguous

19  evidence or when the record is inadequate to allow for proper evaluation of the evidence."  *See*

20  *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).  Plaintiff's primary argument for why

21  the duty to develop the record was triggered in this case is based on the following, albeit incorrect,

22  observation by the ALJ:

23          Given the claimant's allegations of totally disabling symptoms, one might expect to
            see some indication in the treatment records of restrictions placed on the claimant
24          by the treating doctor.  Yet a review of the record in this case reveals no restrictions
            recommended by the treating doctor.
25

26  (Doc. 20 at 16 (citing AR 20).)  What the ALJ and Plaintiff overlook is that the record <u>does</u> contain

27  opinion evidence by a treating source: Dr. Haseeb.  Treating hematologist Dr. Haseeb twice opined

28  in 2016 that Plaintiff was precluded from performing "physically strenuous activity" but was "able

to carry out light or sedentary work (e.g., office work, light house work)."  (AR 556, 559.)  This

opinion was given great weight by the non-examining physician on reconsideration.  (*See* AR 133.)

Thus, the record does not "lack any treating or examining opinion evidence," as Plaintiff contends.[6]

Even if the above-quoted statement from the ALJ's decision had been accurate, the duty to

develop the record would not be implicated in this case.  The ALJ reviewed the record evidence

through April 2018, summarized that record, and found that Plaintiff had not established he was

disabled.  (AR 16–21.)  Plaintiff failed to submit any medical opinions from a treating or examining

physician that supported his allegations of totally disabling impairments, as is his burden.  *Bayliss*

*v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005); *Alvarez v. Astrue*, No. 1:08-cv-01205-SMS, 2009

WL 2500492, at *10 (E.D. Cal. Aug. 14, 2009) (finding absence of report from treating physician

did not give rise to a duty to develop the record where record contained opinions of the state agency

physicians and plaintiff's complete treatment records); *see also* 42 U.S.C. § 423(d)(5)(A) ("An

individual shall not be considered to be under a disability unless he furnishes such medical and

other evidence of the existence thereof as the Commissioner of Social Security may require."); 20

C.F.R. § 416.920(a) ("[Y]ou have to prove to us that you are  . . . disabled . . . .").  The record

contained Plaintiff's complete treatment records, as counsel conceded, and no "gaps" or

inconsistencies were noted.  *See Findley v. Saul*, No. 1:18-CV-00341-BAM, 2019 WL 4072364,

at *6 (E.D. Cal. Aug. 29, 2019) (finding the ALJ was not obligated to further develop the record

where counsel stated at the hearing that the record was complete).  *See also Randolph v. Saul*, 2:18-

cv-00555-CLB, 2020 WL 504667, at *8 (D. Nev. Jan. 31, 2020) (same).  In the absence of any

inadequacy or ambiguity in the record, the ALJ had no duty to develop it further.[7]

---

[6] Because Dr. Hasseb's opinion was relevant to Plaintiff's functional limitations, it was error for the ALJ not to expressly consider it.  *Garrison v. Colvin*, 759 F.3d 995, 1012–13 (9th Cir. 2014).  However, such error is harmless, as fully crediting Dr. Hasseb's opinion would prove entirely consistent with the limitation to sedentary work assessed by the ALJ in Plaintiff's RFC.  *See Stout*, 454 F.3d at 1056 (An ALJ's error is harmful "unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."); *Robbins*, 466 F.3d at 885 (holding that an ALJ's error is harmless if it was "inconsequential to the ultimate nondisability determination").

[7] Because the Court finds that the ALJ's duty to develop is not implicated by the record, it need not reach Plaintiff's argument that, due to mental illness, he was unable to protect his interests at the administrative level, despite being represented by the same attorney as here.  (*See* Doc. 20 at 15.)

### 3.    The ALJ Did Not Err in Formulating Plaintiff's RFC

An RFC "is the most [one] can still do despite [his or her] limitations" and it is "based on all the relevant evidence in [one's] case record," rather than a single medical opinion or piece of evidence. 20 C.F.R. § 416.945(a)(1); *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) ("It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity.").   Further, an ALJ's RFC determination need not precisely reflect any particular medical provider's assessment.  *See Turner v. Comm'r Soc. Sec. Admin*., 613 F.3d 1217, 1222–23 (9th Cir. 2010).

In criticizing the ALJ's failure to develop the record, a criticism the Court has already rejected, Plaintiff contends that the RFC was the result of the ALJ improperly imposing the ALJ's own lay interpretation of the medical evidence.  (*See* Doc. 20 at 17–18.)  This contention is also unavailing.

The nature of the ALJ's responsibility is to interpret the evidence of record, including medical evidence.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  Such a responsibility does not result in the ALJ committing legal error when assessing an RFC that is consistent with the record.  *See Mills v. Comm'r of Soc. Sec*., No. 2:13-CV-0899-KJN, 2014 WL 4195012, at *4 (E.D. Cal. Aug. 22, 2014) ("[I]t is the ALJ's responsibility to formulate an RFC that is based on the record as a whole, and thus the RFC need not exactly match the opinion or findings of any particular medical source.") (citing *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989)).

Here, the ALJ considered the findings of the state agency physicians and evaluated them in the context of the longitudinal record, including the objective medical evidence post-dating the physician's opinions.  (*See* AR 19–20.)  The ALJ then interpreted that evidence, as the ALJ is charged to do, and formulated Plaintiff's RFC.[8]  *See, e.g., Mills,* 2014 WL 4195012, at *4 (finding argument that the ALJ was improperly attempting to "play doctor" lacked merit where the ALJ "carefully analyzed the various medical opinions, treatment records, and plaintiff's own testimony in formulating an RFC.").  Indeed, the ALJ ultimately formulated an RFC that included additional

---

[8] The ALJ's RFC assessment is also based on consideration of the subjective complaint testimony, which, as set forth more fully below, the ALJ properly discredited.

1   physical and social limitations beyond those found by the non-examining physicians.  (*Compare*

2   AR 18 with AR 124–27.)  Plaintiff does not specify what additional functional limitations the

3   record might establish that were not accounted for in the ALJ's RFC assessment.  Nor does Plaintiff

4   otherwise show any inconsistency between the record and his RFC.  To the extent Plaintiff is

5   advocating for an alternative interpretation of the evidence in the record, the Court will not second

6   guess the ALJ's reasonable interpretation, even if such evidence could give rise to inferences more

7   favorable to Plaintiff.  *See Molina*, 674 F.3d at 1110.

8       In sum, the Court finds that substantial evidence supports the ALJ's conclusions regarding

9   the impact of Plaintiff's impairments on the RFC.  Plaintiff may disagree with the RFC, but the

10  Court must nevertheless uphold the ALJ's determination because it is a rational interpretation of

11  the evidence.  *See Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

12  **B.     The RFC Includes a Harmless Typographical Error**

13      Plaintiff contends that the RFC does not support a finding of non-disability, highlighting an

14  inconsistency between the ALJ's stated RFC finding that Plaintiff is limited to "no prolonged

15  ***working*** for greater than about thirty minutes" (AR 18) and the first hypothetical posed to the VE

16  of an individual who was limited to "no prolonged ***walking*** greater than about [thirty] minutes"

17  (AR 42).  According to Plaintiff, it is possible the ALJ intended a "prolonged working" limitation

18  because it is supported by the second hypothetical posed to the VE of an individual who "was only

19  productive 4–6 hours in an eight-hour workday."  (AR 43.)  Plaintiff contends that when the RFC

20  is properly credited, he is disabled based on the VE's testimony.  (AR 43.)  The Commissioner

21  contends that the discrepancy between the RFC and the first hypothetical is scrivener's error.  The

22  Court agrees with the Commissioner.

23      Having reviewed the record, it appears that the ALJ's mention of "prolonged working" is a

24  typographical error.  In her first hypothetical, ALJ asked the VE to assume an individual capable

25  of performing a sedentary range of work with various limitations, including "no prolonged walking

26  greater than about [thirty] minutes."  (AR 42)  Given the limitations in the first hypothetical, and

27  with no past relevant work by Plaintiff to consider, the VE testified that this person could perform

28  other jobs in the national economy, such as table worker, lens inserter, and assembler.  (AR 42–

43.)  Based on the VE's testimony that a person whose RFC included no prolonged walking greater than thirty minutes would be able to perform the requirements of these representative occupations, the ALJ concluded that Plaintiff could perform other work existing in significant numbers in the national economy.  (AR 22.)  Because the ALJ clearly relied on the VE's testimony, it is reasonable to infer that the ALJ intended "prolonged walking," not "prolonged working," in the RFC of her written decision.[9]  *See Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1193 (9th Cir. 2004) ("the Commissioner's findings are upheld if supported by inferences reasonably drawn from the record); *see also Magallanes*, 881 F.2d at 755 (court may draw specific and legitimate inferences from ALJ's decision).

Plaintiff has not shown harmful error.  Other than his subjective testimony, which has been properly discredited (see below), Plaintiff identifies no testimony or evidence in the treatment record to support a finding that he cannot work for longer than thirty minutes at a time.  Dr. Haseeb, the sole source of opinion evidence by a treating physician in the record, found that Plaintiff could perform light or sedentary work.  (AR 556, 559.)  Even the ALJ's second hypothetical to the VE, on which Plaintiff relies in support of his argument, limited the individual to 4-6 hours of productivity per workday.  (AR 43.)  Such limitation is far less restrictive than—and at odds with—a "no prolonged working great than about thirty minutes" requirement.

The Court therefore finds that the apparent typographical error in the ALJ's written decision is harmless.  *Molina*, 674 F.3d at 1115 (ALJ's error harmless where it is "inconsequential to the ultimate nondisability determination") (citation omitted); *Burch*, 400 F.3d at 679 ("A decision of the ALJ will not be reversed for errors that are harmless."); *Jackson v. Colvin*, No. 1:14–CV–01573–EPG, 2016 WL 775929, at *9 (E.D. Cal. Feb. 29, 2016) (court declined to elevate the technical form of the ALJ's decision above its substance and deemed the ALJ's inadvertent omission of a limitation in the express recitation of RFC harmless where the decision included consideration of the omitted limitation); *Gervais v. Colvin*, No. EDCV 12-1115-JPR, 2013 WL

---

[9] In fact, the alternative inference would be unreasonable, as it would render other portions of the RFC superfluous. *See Cleves v. Astrue*, No. C 09–03624 WHA, 2010 WL 682465, at *3 (N.D. Cal. Feb. 24, 2010).  For example, had the ALJ intended a limitation in the RFC that Plaintiff was precluded from working longer than thirty minutes, she would not have needed to include in that same RFC a requirement that Plaintiff "rest every two hours."  (*See* AR 18.)

1    3200518, *6 (C.D. Cal. June 24, 2013) (finding transcription error harmless).

2    **C.      The ALJ Properly Found Plaintiff Less Than Fully Credible**

3          **1.      Legal Standard**

4          In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ

5    must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First,

6    the ALJ must determine whether the claimant has presented objective medical evidence of an

7    underlying impairment that could reasonably be expected to produce the pain or other symptoms

8    alleged. *Id*. The claimant is not required to show that his impairment "could reasonably be

9    expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could

10   reasonably have caused some degree of the symptom." *Id*. (quoting *Lingenfelter v. Astrue*, 504

11   F.3d 1028, 1036 (9th Cir. 2007)). If the claimant meets the first test and there is no evidence of

12   malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms

13   if he gives "specific, clear and convincing reasons" for the rejection.[10] *Id*. As the Ninth Circuit

14   has explained:

15         The ALJ may consider many factors in weighing a claimant's credibility,
16         including (1) ordinary techniques of credibility evaluation, such as the claimant's
           reputation for lying, prior inconsistent statements concerning the symptoms, and
17         other testimony by the claimant that appears less than candid; (2) unexplained or
           inadequately explained failure to seek treatment or to follow a prescribed course
18         of treatment; and (3) the claimant's daily activities. If the ALJ's finding is
           supported by substantial evidence, the court may not engage in second-guessing.
19

20   *Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v.

21   Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009). Other factors the ALJ may

22   consider include a claimant's work record and testimony from physicians and third parties

23   concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Social

24   Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

25         The clear and convincing standard is "not an easy requirement to meet," as it is "'the most

26   demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v.

27   Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). General findings are not enough

28

---

[10] The Court rejects the Commissioner's contention that a lesser standard of review applies. (*See* Doc. 26 at 20 n.10.)

1   to satisfy this standard; the ALJ "'must identify what testimony is not credible and what evidence

2   undermines the claimant's complaints.'"  *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014)

3   (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

4          **2.      Analysis**

5          As set forth above, the ALJ found Plaintiff's "medically determinable impairments could

6   reasonably be expected to cause the alleged symptoms."  (AR 19.)  The ALJ also found that

7   "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these

8   symptoms are not consistent with the medical evidence and other evidence in the record."  (AR

9   19.)  Since the ALJ found Plaintiff's "medically determinable impairments could reasonably be

10  expected to cause the alleged symptoms," the only remaining issue is whether the ALJ provided

11  "specific, clear and convincing reasons" for Plaintiff's adverse credibility finding.  *See Vasquez*,

12  572 F.3d at 591.  Here, the ALJ found Plaintiff's credibility was undermined by several factors: his

13  receipt of "conservative care" (AR 19); his "good clinical recovery" and control of his symptoms

14  with prescribed medication and treatment (AR 20); and his "relatively normal" and "relatively

15  benign" examination findings (AR 19, 20).  The Court takes each finding in turn.

16                  **a.      Conservative Treatment**

17         First, with respect to his complaints of back pain, Plaintiff stated that the pain makes him

18  unable to perform daily tasks (AR 274–76) and limits him to walking for 30 minutes at a time

19  before resting, sitting for a maximum of 30–40 minutes, and lifting 40–50 pounds (AR 19, 35–37,

20  264).  The ALJ noted that, despite Plaintiff's testimony (AR 19), the medical record supports a

21  history of only "moderate" back pain (AR 543–50), for which "there is no evidence [Plaintiff] has

22  sought or received more than conservative care."  (AR 19.)  Although Plaintiff was assessed with

23  bilateral low back pain with left-sided sciatica in October 2016 (AR 546), at most his treatment

24  consisted of the prescription medications Percocet and Soma (AR 34, 259, 323–24, 575).  Plaintiff

25  testified at the hearing that he consulted with a surgeon, who advised against surgery for his back

26  pain.  (AR 34.)

27         Based on the above-described conservative treatment for Plaintiff's back pain, which is

28  supported by the record and not contested by Plaintiff, the ALJ was entitled to discount Plaintiff's

credibility.  *See Parra v. Astrue*, 481 F.3d 742, 750–51 (9th Cir. 2007) (evidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment); *Johnson*, 60 F.3d at 1434 (ALJ may properly rely on the fact that only conservative treatment has been prescribed).  *Jones v. Comm'r of Social Sec.*, No. 2:12–cv–01714–KJN, 2014 WL 228590, at *7–10 (E.D. Cal. Jan. 21, 2014) (ALJ properly found that plaintiff's conservative treatment, which included anti-inflammatory and narcotic medications, diminished plaintiff's credibility).  *See also Rodola v. Saul*, No. CV 20-02900-JEM, 2020 WL 6545864, at *5 (C.D. Cal. Nov. 6, 2020) ("Plaintiff's overall treatment arguably was conservative, consisting of strong pain medications such as Percocet and Soma."); *Esparza v. Astrue*, No. EDCV 10-0929-DTB, 2011 WL 5037049, at *6 (C.D. Cal. Oct. 24, 2011) (considering Soma to be conservative treatment).

Accordingly, the ALJ's adverse credibility determination based on Plaintiff's conservative treatment for his back pain will not be disturbed.

**b.    Improvement with Treatment**

Another reason given by the ALJ for discrediting Plaintiff's subjective statements is that the medical record demonstrates his physical and mental symptoms have improved with treatment and medication.  (AR 20.)  Contrary to Plaintiff's assertion (Doc. 20 at 21), the ALJ summarized Plaintiff's testimony that he is unable to work due to "permanent heart and lung damage" that limits his physical functioning, as well as mental limitations such as difficulty concentrating and being around people due to hearing voices and anger issues.  (AR 19.)  However, as the ALJ also sets forth in its decision, the record is replete with instances showing that treatment and medication improved Plaintiff's symptoms significantly.  (AR 20.)  For example, following his thrombolysis procedure in July 2015, Dr. Haseeb noted Plaintiff was "generally doing well," with no evidence of any disease or pulmonary embolism.  (AR 557.)  Dr. Haseeb's physical examination in October 2016 was normal, with no tenderness or swelling in Plaintiff's back, normal range of motion, no weakness, and normal gait.  (AR 556.)

At a follow up appointment in November 2016, Dr. Javed noted that Plaintiff had made a "good clinical recovery" from his pulmonary embolism and was tolerating his anticoagulation therapy well.  (AR 616.)  In April 2017, Plaintiff was noted by Dr. Haseeb to be "devoid of any

symptoms" and having no problems with issues following thrombolysis.  (AR 781.)  Plaintiff's

liver and kidney function were "essentially unremarkable."  (AR 781.)  Dr. Haseeb observed

Plaintiff was "generally doing excellent" and had no evidence of any progression of thrombosis.

(AR 783.)  An examination of Plaintiff's back produced normal results, including normal range of

motion, strength, and tone, and no tenderness to his back or spine upon palpation and percussion.

(AR 781–82.)  Plaintiff's musculoskeletal examination results were also normal in July 2017 (AR

799) and December 2017 (AR 667–68).  A treatment note from September 2017 showed Plaintiff

continued to do "well," with no new symptoms.  (AR 798.)  He denied chest pain, cough, daytime

fatigue, and wheeze, and reported that he can ambulate without feeling winded or need for an

inhaler  (AR 798.)

The record shows Plaintiff's mental symptoms also improved with treatment.  As the ALJ

noted (AR 20), in April 2016 Plaintiff had decreased anxiety and auditory hallucinations and

reported that his medications were working well.  (AR 448.)  Plaintiff was "doing well" in August

2016, noting "minor" auditory hallucinations but improved sleep.  (AR 451.)  He reported doing

"pretty good" in December 2016, with a better mood and feeling "less wound up."  (AR 811.)  His

irritability was decreased and his auditory hallucinations still present but "manageable" with

medication.  (AR 811.)  In April 2017, Plaintiff gave a similar report that he was "doing well,"

getting good sleep, and that his hallucinations were not unbearable.  (AR 813.)  Plaintiff reported

his sleep was "very good" with a stable mood in August 2017.  (AR 815.)  He reported in April

2018 a decrease in his hallucinations and anxiety with a good mood.  (AR 819.)  Plaintiff testified

at the hearing in August 2018 that he "likes" his medications and that they help him.  (AR 41.)

In evaluating a claimant's claimed symptoms, an ALJ may find a plaintiff less credible

when his or her symptoms can be controlled by treatment and/or medication.  *See* 20 C.F.R. §

416.929(c)(3)(iv); *see also Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments

that can be controlled effectively with medication are not disabling for purposes of determining

eligibility for SSI benefits.").  Here, there is substantial evidence in record, as set forth above, that

Plaintiff's physical and mental conditions improved following his thrombolysis procedure and his

treatment with anticoagulants and anti-psychotic medications.   Plaintiff's improvement with

1  treatment is therefore another clear and convincing reason for discounting his subjective symptom

2  testimony.  *See Morgan v. Comm'r of Soc. Sec. Admin*., 169 F.3d 595, 599 (9th Cir. 1999) (ALJ's

3  adverse credibility determination properly accounted for physician's report of improvement with

4  medication); *Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983) (affirming denial of benefits and

5  noting that claimant's impairments were responsive to treatment).

6          **c.**     **Inconsistency with Objective Medical Evidence**

7        The ALJ's final ground for discounting Plaintiff's credibility is that his allegations of

8  significant limitations are inconsistent with the objective medical evidence—specifically his

9  "relatively normal" and "relatively benign" examination findings.  (AR 19–20.)  Though the

10  Commissioner asserts the ALJ properly discredited Plaintiff on this basis (*see* Doc. 26 at 25),

11  Plaintiff contends that the ALJ was not sufficiently specific in the articulation of this reason to

12  permissibly discredit Plaintiff's testimony (*see* Doc. 20 at 21–22; Doc. 27 at 6).

13        The Court agrees with Plaintiff.  To be sure, the record contains evidence of repeatedly

14  normal examinations and mental status findings, as described previously.  Yet the ALJ failed to

15  specify what parts of this medical evidence undermined Plaintiff's subjective symptom testimony.

16  *See Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015).  Under *Brown-Hunter*, the

17  observations an ALJ makes as part of the summary of the medical record are not sufficient to

18  establish clear and convincing reasons for rejecting a Plaintiff's credibility.  806 F.3d at 494.

19  Instead, the ALJ must link the medical evidence at issue to the Plaintiff's testimony.  *Id*.  Here,

20  the ALJ did not do so.

21        This error is harmless, however.  Contrary to Plaintiff's contention, inconsistency with the

22  medical record was not the sole reason for which the ALJ discredited Plaintiff's testimony.

23  Plaintiff's brief ignores the fact that the ALJ articulated other, permissible reasons for discounting

24  his credibility, specifically, as set forth above, Plaintiff's conservative care and his improvement

25  with treatment.  Thus, the ALJ's lack of linkage is not harmful error.  *See Carmickle v. Comm'r*,

26  533 F.3d 1155, 1162 (9th Cir. 2008) (citing *Batson*, 359 F. 3d at 1197); *Tonapetyan v. Halter*,

27  242 F. 3d 1144, 1148 (9th Cir. 2001).

28        In sum, the Court finds that the ALJ offered multiple clear and convincing reasons to

discredit Plaintiff's testimony regarding the extent of his limitations.  While Plaintiff may disagree with the ALJ's interpretation of the medical evidence (*see* Doc. 20 at 22–23), it is not within the province of this Court to second-guess the ALJ's reasonable interpretation of that evidence, even if such evidence could give rise to inferences more favorable to Plaintiff.  *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citing *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989)).

## D.    The ALJ Did Not Err in Discounting Plaintiff's Wife's Lay Testimony

### 1.    Legal Standard

Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must consider, unless he expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.  *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); *Stout*, 454 F.3d at 1053; *see also* 20 C.F.R. § 416.927(f).  In rejecting lay witness testimony, the ALJ need only provide "arguably germane reasons" for dismissing the testimony, even if she does "not clearly link [her] determination to those reasons."  *Lewis*, 236 F.3d at 512.  An ALJ may reject lay witness testimony if it is inconsistent with the record.  *See, e.g., id.* at 511–12 (rejecting lay witness testimony conflicting with the plaintiff's testimony and the medical record); *Bayliss*, 427 F.3d at 1218 (rejecting lay witness testimony conflicting with the medical record).  The ALJ may "draw inferences logically flowing from the evidence."  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).  Further, "[i]f the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness."  *Molina*, 674 F.3d at 1114.

### 2.    Analysis

The ALJ gave "little weight" to Plaintiff's wife Mrs. Russo's third-party adult function report because:

> it is a lay opinion based upon casual observation rather than objective medical examination and testing.  Further, it is potentially influenced by loyalties of family. It certainly does not outweigh the accumulated medical evidence regarding the extent to which [Plaintiff's] impairments limit her [sic] functional abilities. Ultimately this statement is not persuasive for the same reasons set forth above in finding [Plaintiff's] allegations to be less than wholly consistent.

1  (AR 20.)

2      First, the ALJ did not provide a germane reason when concluding the lay witness testimony

3  was "based upon casual observation, rather than objective medical examination and testing."  To

4  the contrary, SSR 06-03p specifically allows "non-medical sources" to submit reports and

5  testimony about a plaintiff.  *See Dodrill v. Shalala*, 12 F.3d 915, 918–19 (9th Cir. 1993) ("[F]riends

6  and family members in a position to observe a claimant's symptoms and daily activities are

7  competent to testify as to her condition."); *Mary Elizabeth C. v. Saul*, No. CV 19-3723-KS, 2020

8  WL 2523116, at *15 (C.D. Cal. May 18, 2020) (finding reason not germane to the witness because

9  "every lay witness statement is, by definition, a lay opinion based on casual observation rather than

10  medical evidence.").

11      However, the second reason provided by the ALJ is germane to Ms. Russo.  An ALJ may

12  discount lay witness statements where the witness and the claimant had a "close relationship" such

13  that the witness "was possibly influenced by her desire to help" the claimant.  *Greger v. Barnhart*,

14  464 F.3d 968, 972 (9th Cir. 2006).  Here, it is undisputed that Plaintiff and Ms. Russo have a close

15  relationship—they have known each other for 21 years and are married—and Mrs. Russo assists

16  Plaintiff with his daily activities.  (*See* AR 274–76.)  Thus, it is reasonable to conclude that Ms.

17  Russo's statements may have been influenced by her desire to help Plaintiff.

18      The ALJ's last reason for discounting Ms. Russo's statement is also germane.  An ALJ may

19  discredit lay testimony that is substantially similar to a plaintiff's validly discredited allegations.

20  *See Valentine*, 574 F.3d at 694.  Here, Ms. Russo's statement largely corroborates Plaintiff's

21  testimony, in that they both indicate Plaintiff was less functional than found by the ALJ due to

22  Plaintiff's back pain, anxiety, depression, and auditory hallucinations.  (*E.g., compare* AR 264

23  (Plaintiff stated that his back pain makes it impossible to stand, sit, or walk for more than a few

24  minutes at a time) *with* AR 274–76 (Ms. Russo stated Plaintiff's back pain makes him unable to

25  perform daily tasks, including personal care and cooking; *compare* AR 38, 264 (Plaintiff stated his

26  mental conditions make talking and interacting with others "very hard.") *with* AR 274 (Ms. Russo

27  stated that Plaintiff has a "hard time" being around others due to his anxiety, depression, and

28  hearing voices.); *compare* AR 269 (Plaintiff stated he gets aggressive when around others due to

his anxiety and auditory hallucinations and avoids being in public.) *with* AR 279 (Ms. Russo reported Plaintiff gets aggressive and agitated easily due to his anxiety and hallucinations and avoids people.); *compare* AR 265 (Plaintiff reported he has trouble sleeping due to hearing voices.) *with* AR 275 (Ms. Russo stated Plaintiff has trouble sleeping due to back pain and his hallucinations.); *compare* AR 266 (Plaintiff reported Ms. Russo helps him dress and bathe, and he needs reminders for personal grooming and to take medication.) with AR 275 (Ms. Russo reported that she must remind Plaintiff to complete personal grooming tasks and to take his medications.); *compare* AR 34, 269, 271 (Plaintiff reported he is able to lift 10–15 pounds; can stand and walk for 10–15 minutes at a time; can sit for 30 minutes at a time; is "very limited" in his ability to squat, bend, climb, and kneel; and cannot remember tasks, concentrate, or follow directions well due to hearing voices.) *with* AR 279, 281 (Ms. Russo stated that Plaintiff can only lift 5–10 pounds; can walk 10 minutes at a time; can sit 20 minutes at a time; cannot squat, bend, kneel, or climb; and has trouble following directions and completing tasks due to memory problems.)

Based on the foregoing, the Court finds that the ALJ provided at least two reasons germane to Ms. Russo that were supported by the record and sufficiently specific to allow the Court to conclude that ALJ properly rejected the lay testimony. Remand for reevaluation of Ms. Russo's third-party witness statement is therefore not warranted.

## V. CONCLUSION AND ORDER

After consideration of Plaintiff's and the Commissioner's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **February 18, 2021**                                  /s/ *Sheila K. Oberto*
                                                           UNITED STATES MAGISTRATE JUDGE